Romaine **CRAWFORD–MULLEY,**
Plaintiff,

v.

**CORNING INCORPORATED,**
Defendant.

No. 99–CV–6323L.

United States District Court,
W.D. New York.

March 29, 2002.

Michael Sussman, Sussman Law Offices, Goshen, NY, for Plaintiff.

Joseph J. Schoellkopf, Jr., Damon & Morey, Buffalo, NY, Jill K. Schultz, Nixon Peabody LLP, Rochester, NY, for Defendant.

## DECISION AND ORDER

LARIMER, Chief Judge.

### Procedural Background

In this action, plaintiff Romaine Crawford–Mulley ("Crawford–Mulley"), alleges that her former employer, defendant Corning Incorporated ("Corning"), discriminated against her on the basis of her race in violation of 42 U.S.C. § 1981 (" § 1981") and the New York State Human Rights Law ("HRL"), N.Y. Exec. Law § 296.[1] Currently before the Court, is Corning's motion for summary judgment (Dkt.# 21), pursuant to FED. R. CIV. P. 56. For the

---

1. Plaintiff's claims for relief were originally asserted under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") and the HRL. In 1999, Corning moved to dismiss, pursuant to FED. R. CIV. P. 12(b)(6), because plaintiff failed to file suit within ninety days of receipt of her right to sue letter. Plaintiff opposed the motion and cross-moved to amend the complaint to add a § 1981 claim. By Decision and Order, entered December 22, 1999, I dismissed plaintiff's Title VII claims as untimely. Dkt. # 12.

Immediately after the decision in Lauture v. International Bus. Machines Corp., 216 F.3d 258 (2d Cir.2000), in which the Second Circuit held, as a matter of first impression, that an at-will employee may sue for wrongful discharge under § 1981, I granted plaintiff's cross-motion to amend to allege a § 1981 claim. Decision and Order, entered June 22, 2000, Dkt. # 13. Plaintiff thereupon amended her complaint to add such a claim. The only remaining claims, therefore, arise under § 1981 and the HRL.

reasons that follow, Corning's motion is granted.

## Factual Background

*Plaintiff's Employment History*

Plaintiff was hired by the Corning Glass Center in March 1990. Her starting salary at that time was $68,000. In her last position at Corning, plaintiff's annual salary had risen to $100,338. Her position at that time was director of the Corning Museum of Glass.

*Expansion of the Corning Glass Center and the Selection of its President*

In the 1990's, Corning embarked on a plan to renovate and expand Corning Glass Center. The plan included merging the Corning Glass Center and the Corning Museum of Glass into a single new entity known as the Corning Museum of Glass ("the Museum"). Corning's chief financial officer and vice chairman of finance and administration, Van C. Campbell ("Campbell"), was charged with the responsibility of identifying someone to take the position of president for the new Museum. Campbell decided that the position should be filled by someone with corporate officer-level experience, and specifically, a senior executive who had a long history with Corning and who understood the unique roles of the Corning Glass Center and the Corning Museum of Glass. Campbell's choice for this appointment was E. Marie McKee ("McKee"), who had previously been senior vice president of human resources at Corning.

*McKee's Interactions with Plaintiff*

McKee assumed her new position as president of the Museum in late 1997. Within months thereafter, McKee changed plaintiff's reporting relationship so that plaintiff reported directly to McKee, rather than to someone beneath McKee. McKee also appointed plaintiff to the Museum's Board of Trustees. In this capacity, plaintiff served with a select group of top Corning executives and community leaders.

The parties agree that it was plaintiff's responsibility in her position as director to develop a plan that covered the areas of the advertising, marketing, and public relations for the Museum. For McKee, this particular responsibility was the centerpiece of plaintiff's new role in the Museum. McKee instructed plaintiff to lead the development of the marketing plan with collaboration from the Museum senior management team.

In May 1998, plaintiff provided McKee with a portion of her draft marketing plan for review. McKee was disappointed with plaintiff's effort and had specific concerns with the content of the document and the lack of coordination with other key individuals in preparing it. Corning further maintains that McKee shared her concerns with Kenneth Jobe, the project leader for the Glass Center expansion project. Jobe conveyed his concerns about plaintiff's work to plaintiff as well.

McKee's concerns about plaintiff's performance can be grouped into four broad categories. First, McKee believed that plaintiff lacked strategic skills necessary for the role of director. Second, McKee was concerned that plaintiff demonstrated poor alliance skills. Third, McKee observed that plaintiff possessed weak planning skills and was unable to satisfactorily follow through on significant projects. Fourth, McKee thought that plaintiff made serious miscalculations in the marketing plan in terms of projecting business and financial results for the merged entity.

Based upon those concerns, McKee informed plaintiff on September 14, 1998 that she had decided to remove plaintiff from her position as director. Rather than terminate plaintiff, McKee provided plaintiff with an array of options including (1) taking on a small project role that would allow plaintiff time to determine her next

full-time career move; (2) going to "in-placement" services for two or three months with the goal of "spending all of you [*sic*] time trying to see if we can find another job in Corning Inc."; (3) outplace-ment and severance; and (4) some combi-nation of the above. Although McKee did not give plaintiff the option of continuing in her role is director, she did offer Craw-ford–Mulley the possibility of moving lat-erally within the Museum or Corning.

Rather than select one of the options offered her at the September 14, 1998 meeting, Crawford–Mulley left work and went out on medical leave. Plaintiff's medical note is decidedly vague, and her only explanation is that she suffered an "anxiety attack."

Subsequently, Crawford–Mulley wrote McKee expressing her desire to handle small projects and to spend 50 percent of her time searching for suitable, compara-ble employment at Corning or elsewhere. Corning notes that after plaintiff retained an attorney, however, she instead stated that she wanted to resign. As part her offer to resign, Crawford–Mulley request-ed her full salary for six months with a promise that she would devote 50 percent of her time to seeking employment else-where. The Museum thereupon agreed to this proposal, and, in what Corning calls a good faith gesture, allowed plaintiff to de-vote all of her time toward seeking em-ployment elsewhere while she continued to receive her full salary and benefits for six months. In addition, the Museum offered plaintiff access to Career Development Services, a nationwide career counseling firm, at the Museum's expense.

Corning charges that, in the ensuing six months, plaintiff made no attempt to se-cure another position at the Museum or at Corning, did not utilize the counseling of Career Development Services, and left her employment at the Museum with no job in hand.

Plaintiff commenced this action on July 27, 1999.

## DISCUSSION

Defendant now moves, under F ED. R. C IV. P. 56, for summary judgment, assert-ing that plaintiff's complaint should be dis-missed in its entirety because Corning had legitimate nondiscriminatory reasons for its actions, and plaintiff cannot establish pretext.

### A. Summary Judgment—General Standards

The standard for deciding summary judgment motions is well established. Rule 56(c) provides that a motion for sum-mary judgment shall be granted if the pleadings and supplemental evidentiary materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Under the rule, the bur-den of demonstrating the absence of any genuine issue of material fact rests on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving par-ty has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]he non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Id.* at 587, 106 S.Ct. 1348 (emphasis in original) (quoting Fed.R.Civ.P. 56(e)).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348. When perusing the record to determine whether a rational fact-finder could find for the non-moving party, how-

ever, all reasonable inferences must be drawn in favor of the non-moving party. *See Murray v. National Broadcasting Co.,* 844 F.2d 988, 992 (2d Cir.), *cert. denied,* 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988).

The general principles underlying a motion for summary judgment fully apply to discrimination actions. *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases"). Although courts should be cautious about granting summary judgment in cases where motive, intent or state of mind are at issue, *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988); *Montana v. First Federal Savings and Loan Ass'n of Rochester,* 869 F.2d 100, 103 (2d Cir.1989), "the salutary purposes of summary judgment— avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to ... other areas of litigation." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985) (summary judgment rule would be rendered sterile if mere incantation of intent or state of mind would act as a talisman to defeat an otherwise valid motion).

Consequently, once the moving party has met its burden, the non-moving party in a discrimination action must come forward with evidence upon which a rational fact-finder could return a verdict in her favor. *See Ellenbogen v. Projection Video Services, Inc.,* 99–CV–11046, 2001 WL 736774 (S.D.N.Y. June 29, 2001) (in re-

sponding to summary judgment motion, plaintiff alleging discrimination is not absolved "from the responsibility of producing sufficient evidence from which a reasonable juror could return a verdict in his favor"). For a plaintiff in a discrimination case to survive a motion for summary judgment, she must do more than present "conclusory allegations of discrimination," *Meiri v. Dacon,* 759 F.2d 989 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); she must offer "concrete particulars" to substantiate the claim. *Id.* (cited in *Duprey v. Prudential Ins. Co.,* 910 F.Supp. 879 (N.D.N.Y.1996)). For its part, the court in a discrimination case examines "the entire record to determine whether the plaintiff could satisfy her 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Schnabel v. Abramson,* 232 F.3d 83, 90 (2d Cir. 2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

## B. Plaintiff's Race Discrimination Claims

Plaintiff brings her race discrimination claims under § 1981, which provides that "[a]ll persons ... shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens." Subsection (b) of § 1981 defines "make and enforce contracts" to include "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

■ Plaintiff relies primarily on two claims of race discrimination[2]: first, she

---

**2.** Plaintiff's counsel confirmed at argument that plaintiff was not asserting any claim based on an alleged hostile work environment, and he conceded that the other matters referenced in the amended complaint, such as plaintiff's allusions to her lack of promotion and the advancement of Dr. Whitehouse, are

not separate claims but instead evidentiary matters that may be considered to determine racial animus. Indeed, plaintiff admits that the evidence she offers concerning the years preceding 1998 are "not actionable." Plaintiff's Memorandum of Law, p. 19, Dkt. # 29. In any event, the applicable three-year stat-

alleges that Corning's failure to offer the presidency of the Museum of Glass to plaintiff was motivated by her race; and, second, she contends that Corning's decision to remove her from her position as director was also discriminatorily motivated. Amended Complaint, ¶ 28, Dkt. # 14. Section 1981, in its present form, has been construed to cover both kinds of claims. *See Lauture v. International Bus. Machines Corp.*, 216 F.3d at 261.

■ Courts analyze § 1981 claims, like the ones in this case, under the same framework as claims brought pursuant to Title VII. *See Olmstead v. L.C.*, 527 U.S. 581, 617, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000).[3] That framework involves the familiar burden-shifting paradigm developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later refined in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). First, a plaintiff must establish a *prima facie* case of race discrimination. Once plaintiff has made out a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory business rationale for its actions. If the employer articulates such a reason, the burden shifts back to the plaintiff to prove that the employer's stated reasons are pretextual. *See Reeves v. Sanderson Plumb-*

*ing Products, Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

■ In order to establish a § 1981 claim, plaintiff must show: "(1) that she is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) that the discrimination concerned one or more of the activities enumerated in § 1981." *Lauture v. International Bus. Machines Corp.*, 216 F.3d 258, 261 (2d Cir.2000). For purposes of the instant motion, Corning does not challenge plaintiff's assertions that she has raised a *prima facie* case. Corning Memorandum of Law, p. 12, nte. 13, Dkt. # 25. Therefore, this motion turns first on whether Corning has satisfied its burden of articulating a legitimate non-discriminatory reason for its actions, and then hinges on whether plaintiff has come forward with sufficient evidence that Corning's proffered explanations were merely pretextual and that its actual motivations more likely than not were discriminatory. *See St. Mary's Honor Ctr.*, 509 U.S. at 510–511, 113 S.Ct. 2742; *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.2000). Plaintiff's claims will be addressed *seriatim*.

1. *Appointment of McKee as President of the Museum*

■ The evidence before me establishes that Campbell alone was charged with the responsibility of identifying someone to take the position of president for the new Museum.[4] It is not disputed that Camp-

---

utes of limitation both with respect to plaintiff's § 1981 claims and her HRL claims preclude any claims premised on events which occurred before July 27, 1996.

3. Race discrimination suits brought under the HRL are subject to the same analysis as claims brought under the § 1981 and Title VII. *See Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1177 (2d Cir.1996); *Tomka v. Seiler*

*Corp.*, 66 F.3d 1295, 1304 n. 4 (2d Cir.1995); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1180 (2d Cir.), *cert. denied*, 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

4. At argument, plaintiff's counsel incorrectly speculated that Jobe was the decision-maker, an assertion that is contradicted by Jobe's deposition testimony.

bell decided that the position should be filled by someone with corporate officer-level experience, and specifically, a senior executive who had a long history with Corning and who understood the unique roles of the Corning Glass Center and the Corning Museum of Glass. Campbell states that he chose McKee because (1) she was a senior executive with a long history with the company, (2) he had worked with her for nearly 20 years and respected her leadership skills and credentials, and (3) he viewed her extensive background in human resources as a valuable asset given the oversight role that she would have over the merger of the two different organizations.

Campbell further submits that McKee was the only person whom he seriously considered to take on this assignment. Campbell never considered plaintiff for the position because she was not a senior executive at Corning. In fact, plaintiff's wage grade at the time was 51 (middle manager level) and McKee's was 88 (senior executive level). In light of these facts, Corning has met its burden of articulating a legitimate, non-discriminatory reason for its decision to offer the position to McKee, rather than Crawford–Mulley.

Since this is a motion for summary judgment, Crawford–Mulley must show the existence of a genuine issue of fact concerning whether Corning's stated reason is a pretext for race discrimination. FED. R. CIV. P. 56; *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 509 (2d Cir.1994); *LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 843 (2d Cir.1993), *cert. denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). Viewing the record in the light most favorable to Crawford–Mulley, I believe that she has failed to meet this burden.

■ Aside from the fact that McKee is Caucasian, plaintiff relies principally on her own belief that she was more qualified

for the position than McKee, Plaintiff contends that her race must have been the reason she was not offered the position because, in her opinion, McKee lacked experience in marketing, art, design and glass, while plaintiff, on the other hand, was experienced in each of those areas, and "had an entrepreneurial approach." It is settled, however, that an employee's subjective opinions about her qualifications or the lack of another candidate's qualifications are insufficient to give rise to a triable issue of fact concerning whether the employer's proffered reason for its actions is a pretext for discrimination, and that is particularly true where the employer's decision whether to offer a position to plaintiff did not depend simply on whether she was qualified, but on whether she was the best candidate for the job. *Layaou v. Xerox Corp.*, 999 F.Supp. 426, 433 (W.D.N.Y.1998); *see also Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 130 (2d Cir.1996) (promotion case) (plaintiff cannot show pretext simply "by asserting her personal belief that she was the most qualified person for the various positions").

That plaintiff never made any formal application for the presidency of the Museum is perhaps even more damaging to her claim. In addition, plaintiff concedes that she never approached Campbell, who made the decision, about her possible candidacy for the position. The best she can do is to state that she expressed interest in the job to her supervisor, Jobe, who told her that she would not be considered because she lacked "good community relationships." Because plaintiff never took the matter further, I cannot see how plaintiff can demonstrate that McKee's hiring and the failure to appoint plaintiff was occasioned by race.

■ Undaunted, plaintiff suggests that her qualifications were such that she could not have been rejected for any reason

other than her race. As the Second Circuit has noted, "[w]hen a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer ... the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff...." *Byrnie v. Town of Cromwell,* 243 F.3d 93, 103 (2d Cir.2001) (citation omitted).

A review of McKee's credentials reveals that, if anything, they are more impressive than those of plaintiff. Indeed, even Crawford–Mulley concedes that McKee had a twenty-year history at Corning. At that time, plaintiff had been with Corning less than eight years. Crawford–Mulley also admits that McKee was a senior executive, while plaintiff was not. In addition, McKee had a master's degree in education, and she attended a three-month certificate program in management at Simmons College. McKee Dep., pp. 29–30. Plaintiff, on the other hand, admitted that she had no further formal education after she received her bachelor's degree. Plaintiff's Dep., p. 9. Even taking all inferences in plaintiff's favor, however, there is no objectively unreasonable disparity between McKee's credentials and those of Crawford–Mulley such that plaintiff would be deemed better qualified. *See Byrnie,* 243 F.3d at 102–07; *Denney v. City of Albany,* 247 F.3d 1172, 1178 (11th Cir.2001) ("[o]ur precedent, however, requires a strong showing of a disparity in qualifications in order for an inference of discrimination to arise").

■ Plaintiff attempts to bolster her claim by offering the hearsay statement of an outside consultant who purportedly considered her a "good fit for the position." Dkt. # 31, ¶ 10. Such a statement is inadmissible, and cannot create a triable issue of fact. Moreover, it was the perception of Campbell, the decision-maker, which is relevant, not that of an outside consultant. *See Smith v. Flax,* 618 F.2d 1062, 1067 (4th Cir.1980).

This is simply a case of a person who disagrees with the reasons articulated for her failure to obtain a certain position, one for which she failed to submit any formal application. Having thoroughly reviewed the record before me in a light most favorable to the plaintiff, I find no evidence to suggest that Corning's stated non-discriminatory reasons for its decision not to offer the position in question to Crawford–Mulley were false, and plaintiff's speculation concerning the employer's motivation is insufficient to establish pretext. *See Schnabel,* 232 F.3d at 88, n. 2 (2d Cir.2000) (quoting *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097) ("while *McDonnell Douglas* provides a useful analytical framework, ... 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff'"); *see also Ellenbogen v. Projection Video Services, Inc.,* 99–CV–11046, 2001 WL 736774 (S.D.N.Y. June 29, 2001) (promotion case). I, therefore, conclude that summary judgment is appropriate on her claim that she was denied the presidency of the Museum based upon her race.

*2. The Removal of Plaintiff as Director of the Museum*

■ Corning asserts that plaintiff was removed from her position as director on September 14, 1998 because of poor performance. More specifically, Corning maintains that (1) Crawford–Mulley lacked strategic skills necessary for the role of director; (2) plaintiff demonstrated poor "alliance skills" in that she failed to jointly develop the Museum marketing plan with all stakeholders in the organization, dem-

onstrating that she was either unwilling or unable to collaborate and build alliances with her peers and lead a team; (3) Crawford–Mulley possessed weak planning skills and was unable to follow through on projects, citing Crawford–Mulley's poor presentation at a June 3, 1998 communications meeting to advise employees of the merger; and (4) Crawford–Mulley's draft marketing plan for the Museum was deficient, and she used erroneous assumptions on the number of bus visitors to the Museum in 1999. These reasons, whether taken individually or collectively, satisfy Corning's burden of articulating a legitimate, non-discriminatory reason for its action. *See Khan v. Costco Wholesale, Inc.*, 99–CV–3944, 2001 WL 1602168, *5 (E.D.N.Y. December 13, 2001) ("[r]egardless of whether defendants were correct in their assessment of the situation, their belief that [plaintiff] was engaged in [improper conduct] was, at the very least, a legitimate, defensible position").

There is no dispute that the decision to remove plaintiff from her position on September 14, 1998 was McKee's decision alone, and plaintiff concedes that McKee, the decision maker, never directed any racially biased comment toward her or acted impermissibly concerning race. In fact, it appears that McKee had taken some favorable action toward plaintiff: she saw to it that plaintiff reported directly to her, and she appointed her to the Museum's Board of Trustees, a very prestigious position. Although it may not be dispositive of the issue, the fact that, during her eight year tenure at Corning, plaintiff's salary increased from $68,000 to over $100,000 does not suggest that the door to advancement for plaintiff was closed at Corning. In large measure, plaintiff does not dispute these basic facts.

Crawford–Mulley takes issue with Corning's assertion that McKee "promoted" her. Nevertheless, there can be no dispute that it is generally considered positive when an employee's direct supervisor is higher in the corporate chain of command. Plaintiff was given the benefit of reporting to McKee and not one of her subordinates. With respect to her appointment to the Museum's Board of Trustees, plaintiff contends that, in her opinion, she should have been appointed to the Board earlier, and states that she considered herself a "token Black" on the Board. Plaintiff's opinions and theories do not establish pretext, however. Her beliefs are entirely her own; they are uncorroborated, and she never alleges that anyone in a position of authority made similar comments. As Corning asserts, the crucial point is that plaintiff's appointment on the Board was McKee's decision, and the timing and significance of her action undermines any suggestion that McKee harbored any discriminatory animus toward plaintiff.

Plaintiff also contends that the list of performance problems given to plaintiff on September 14, 1998 was manufactured to disguise McKee's racial animus. In support, plaintiff argues that her prior performance reviews had been very favorable. However, plaintiff's reliance on her past performance evaluations does not establish pretext here. *See Hines v. Hillside Children's Center*, 73 F.Supp.2d 308, 315 (W.D.N.Y.1999) ("good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual"). Moreover, plaintiff's personal opinion of her performance neither creates an inference of discrimination nor constitutes evidence of pretext. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1039 (10th Cir.1993) (employee's own assessment of his job performance is inadequate to raise issue of fact for trial); *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991) ("[t]he fact that an employee disagrees with an employer's evaluation of

him does not prove pretext"), overruled in part on other grounds by *St. Mary's Honor Center,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407; *cf. Goldberg v. B. Green & Co., Inc.,* 836 F.2d 845, 848 (4th Cir.1988). In addition, I note that even plaintiff seems to admit that there were problems between plaintiff and her last two supervisors, McKee and Jobe.

■■■■■ In any event, whether plaintiff considers her work to have been good enough for her to retain her position, or even whether her work *was* good enough, is not the issue. What matters is why Corning did what it did, not whether it was wise to do so. The Second Circuit has made it clear that an "employee may be discharged 'on the basis of subjective business judgments, for any reason that is not discriminatory.'" *Fierro v. Saks Fifth Ave.,* 13 F.Supp.2d 481, 489 (S.D.N.Y.1998) (quoting *Thornley v. Penton Publ'g,* 104 F.3d 26, 29 (2nd Cir.1997) (citation omitted)). It is axiomatic that section 1981 prohibits discrimination, not poor judgment. *Cf. Gumbs v. Hall,* 51 F.Supp.2d 275, 282 (W.D.N.Y.1999); *see also Montana v. First Fed. Savings and Loan Assn. of Rochester,* 869 F.2d 100, 106 (2d Cir.1989) (federal courts do not have a "roving commission to review business judgments") (quoting *Graefenhain v. Pabst Brewing Co.,* 827 F.2d 13, 21 n. 8 (7th Cir.1987)); *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1116 (2d Cir. 1988) ("[e]vidence that an employer made a poor business judgment generally is insufficient to establish a question of fact as to the credibility of the employer's reasons"); *Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.) (courts "must refrain from intruding into an employer's policy apparatus or second-guessing a business's decision-making process"), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *Mesnick v. General Electric Co.,* 950 F.2d 816, 825 (1st Cir.) ("[c]ourts may not sit as super personnel departments, assessing

the merits—or even the rationality—of employers' non-discriminatory business decisions"), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *Graefenhain,* 827 F.2d at 20 ("[a] business decision need not be good or even wise. It simply has to be nondiscriminatory..."). Employers should be free to remove a person that they honestly (even if erroneously) consider a poor performer without being subjected to liability merely because the individual is a member of a protected classification.

Plaintiff also complains that she was deprived of "variable pay" in her employment at the Museum. Corning maintains that McKee's decision to remove variable pay from the compensation packages of all former Corning Glass Center employees was to conform the pay practices of the Corning Glass Center with those of the new Museum. All employees, regardless of race, were compensated on a base pay and new goal sharing format, effective July 1, 1998, and "variable pay" was removed for all of them. Corning further asserts that this change did not disadvantage plaintiff, because at the time the new compensation plan went into effect, plaintiff's base pay was *increased* by six percent. As Corning characterizes it, plaintiff received a guaranteed six percent increase in her base salary in exchange for an unguaranteed variable bonus. These facts do not establish pretext either.

In addition, Crawford–Mulley makes much of a meeting she attended at which Corning's present chief executive officer, John Loose, stated: "[w]e don't want Corning to look like the NBA." Crawford–Mulley interprets this statement as suggesting that Corning did not want to become "too Black." Even if true, this stray remark is insufficient to establish pretext as to plaintiff for a variety of reasons. First, Loose did not become Corning CEO

until January 2001, and he had absolutely no involvement in the 1998 decisions regarding Crawford–Mulley. Second, the evidence before me suggests that the statement in issue was made on February 29, 1996, more than two years before the events about which Crawford–Mulley now complains. Third, the comment was made more than three years before plaintiff commenced this action, and, therefore, is outside the applicable statutes of limitation. While it may have been unwise, this comment was, at best, a single, stray remark with no demonstrated nexus to the adverse employment decisions pertaining to plaintiff.

Plaintiff also implies that James Stokes, an African–American Corning employee, was terminated shortly after he voiced his negative reaction to Loose's statement. The evidence, however establishes that Stokes was one of numerous employees who were impacted by a reduction in force after Corning sold its Serengetti sunglasses division. Moreover, his termination did not occur until a year and a half after Stokes allegedly made the comments that plaintiff suggests resulted in retaliation by Corning.

■ In short, the record is devoid of any direct evidence of racial animus. As the Second Circuit has instructed, however:

> Of course, direct evidence of discrimination is not necessary. *Norton v. Sam's Club,* 145 F.3d 114, 119 (2d Cir.1998). If there is sufficient circumstantial evidence on which to build a case, it is for the jury to determine what inferences can be drawn from that evidence. However, a jury cannot infer discrimination from thin air. *Id.* Plaintiffs have done little more than cite to their mistreatment and ask the court to conclude that it must have been related to their race. This is not sufficient. *See id.* at 120 (explaining that anti-discrimination law

"does not make [defendants] liable for doing stupid or even wicked things; it makes them liable for discriminating"). *Lizardo v. Denny's, Inc.,* 270 F.3d 94, 104 (2d Cir.2001).

For all of these reasons, I find that plaintiff has presented no evidence upon which a reasonable trier of fact could base the conclusion that race was a determinative factor in Corning's decision to remove her from her position. *See Alban–Davies v. Credit Lyonnais Securities, Inc.,* 00–CV–6150, 2001 WL 884113 (S.D.N.Y. Aug.8, 2001). Therefore, she cannot meet what the *Reeves* Court reaffirmed was her "ultimate burden." *Reeves,* 530 U.S. at 143, 120 S.Ct. at 2106 (internal quotation marks omitted). Summary judgment in defendant's favor on plaintiff's claim that she was removed from her position on the basis of her race is warranted.

### 3. *Crawford–Mulley's Resignation*

■ Crawford–Mulley appears to liken the decision to remove her from her position as director in September 1998 to a discriminatory termination. *See* Amended Complaint, ¶ 28, Dkt. # 14; Plaintiff's Memorandum, pp. 19–20, Dkt. # 29. I disagree. There is no evidence in the record suggesting that plaintiff was terminated in September 1998. To the contrary, the document delivered to plaintiff on September 14, 1998 establishes that plaintiff was offered an array of options including (1) taking on a small project role that would allow plaintiff time to determine her next full-time career move; (2) going to "in-placement" services for two or three months with the goal of "spending all of you [*sic* ] time trying to see if we can find another job in Corning Inc."; (3) outplacement and severance; and (4) some combination of the above. McKee Aff., Dkt. # 22, Ex. A. Although McKee did not give plaintiff the option of continuing in

her role as director, she did offer Crawford–Mulley the possibility of moving laterally within the Museum or Corning. The mere fact that plaintiff lost her position as director does not necessarily mean that she was terminated from Corning.

By letter dated October 27, 1998, Crawford–Mulley wrote McKee expressing her desire to handle small projects and to spend 50 percent of her time searching for suitable, comparable employment at Corning or elsewhere. *Id.*, Ex. B. In her letter, plaintiff also expressed her "hopes that [she] can continue to be of service to the company." It appears that plaintiff subsequently offered to resign. *See id.*, Ex. C. As part of her offer, Crawford–Mulley requested her full salary for six months with a promise that she would devote 50 percent of her time to seeking employment elsewhere. The Museum thereupon agreed to this proposal, and even allowed plaintiff to devote all of her time seeking employment elsewhere while she continued to receive her full salary and benefits for six months. In addition, the Museum offered plaintiff access to Career Development Services, a nationwide career counseling firm, at the Museum's expense.

■ Given these facts, it is surprising that plaintiff even tentatively asserts the possibility of a constructive discharge claim. In order to establish such a claim, plaintiff would be required to prove that she found her working conditions "so intolerable" that she was forced into an involuntary resignation. *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir.1993). Plaintiff's initial decision to remain at the Museum while she looked for a lateral position demonstrates that she did not consider her working conditions to be "intolerable." Plaintiff herself removes any doubt on this issue when she admits that she "resigned" (plaintiff's declaration, ¶ 16, Dkt. # 31), and that she attributes her resignation to her belief that "she was not wanted," rather than any suggestion that she found her working conditions "intolerable." Plaintiff Statement of Facts, ¶ 27, Dkt. # 30.

For these reasons, plaintiff's constructive discharge claim, to the extent she raises one, is dismissed.

### CONCLUSION

For all of the foregoing reasons, defendant's motion for summary judgment (Dkt.# 21) is granted. The complaint is dismissed with prejudice.

IT IS SO ORDERED.